FILED

12/05/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0309

DA 16-0309

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 299

FLORENCE J. LARSON and DWIGHT W. LARSON,

        Plaintiffs and Appellants,

   v.

DOUG E. LARSON,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Toole, Cause No. DV 09-037
Honorable Robert G. Olson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Kirk D. Evenson, Marra, Evenson & Bell, P.C., Great Falls, Montana

        For Appellee:

        W. Scott Green, Daniel L. Snedigar, Patten, Peterman, Bekkedahl &
Green, P.L.L.C., Billings, Montana

Submitted on Briefs:  September 13, 2017

Decided:  December 5, 2017

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1 Plaintiffs Dwight W. Larson ("Dwight") and Florence J. Larson ("Florence"), through her Conservator Joyce Wuertz ("Wuertz"), appeal the December 29, 2015 Findings of Facts, Conclusions of Law and Judgment by the by the Ninth Judicial District Court, Toole County. We address the following issues:

> *Issue One: Whether the District Court erred in finding no undue influence by Doug over Florence.*
>
> *Issue Two: Whether the gift of stock certificates was actually a contract for which Doug furnished no consideration.*
>
> *Issue Three: Whether the District Court erred in finding Florence made a valid gift of D & D Land Co. stock certificates to Doug.*

¶2 We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 This case concerns whether Florence, mother of Dwight and Doug Larson ("Doug"), properly and without undue influence, gifted her shares in the family farm corporation, to Doug.

¶4 In 1964, Florence and Edward Larson ("Ed") began farming in Toole County. In 1973, Ed and Florence formed D & D Land Company ("D & D") as the operating entity for the family farm. Originally, Ed held 31,200 shares, Florence held 8,800 shares, and D & D retained 10,000 shares. In 1984, Ed and Florence executed their wills, providing the surviving spouse would own 51% "of the total voting rights of D & D Land Company" with the remaining balance going to sons, Dwight and Doug, in equal shares. At that time, Ed held 20,005 shares and Florence held 19,995 shares. Since 1987, D & D

has employed Doug as the full-time farm manager. Dwight lives in Billings, where he is a teacher. In 1999, Ed gifted 10 shares to Doug, leaving Ed with 19,995 shares and Florence with 19,995 shares.

¶5 Ed passed away on March 16, 2006. Florence served as the Personal Representative of Ed's estate and hired attorney Gary Bjelland ("Bjelland") to probate the estate. Florence continued to keep the books for the farm's operations while Doug took over the primary operations of the farm. Over the next two years, Florence met with Bjelland and Denise Frigge ("Frigge")—Florence's long-time friend and an accountant with the firm of Brown, Fitchner and Associates in Conrad—to discuss her husband's estate and her own estate. Dwight attended some of these meetings. Doug attended all of these meetings.

¶6 During a December 2007 meeting, Frigge explained that Florence would need D & D assets out of her name for five years if Florence wanted to avoid D & D assets being depleted to pay for her future nursing care. Florence expressed her desire that D & D remain a viable family farm, which she believed would not be possible if the property was divided equally between Dwight and Doug upon her death. Florence also expressed her strong desire to stay on the farmstead she built with her husband and to assist in D & D operations for as long as possible.

¶7 In early 2008, after Florence expressed interest in giving her shares to Doug, Dwight began calling Florence. Dwight taped at least four long calls, and testified that he called his mother more than the calls he taped. Dwight would keep Florence on the phone for an hour at a time and repeatedly tell her that she should not change her will and

should leave things as "Dad left them." Dwight complained that he would not get his fair share if she changed her will and that Doug had enough land. On March 12, 2008, after Dwight called and woke Florence up, she told him she could not split the farm fifty-fifty "because it won't be enough to run the farm."

¶8 On February 20, 2008, Dwight drove Florence to Bjelland's law offices for a meeting, and she arrived visibly upset. During the meeting, Florence told Dwight in front of Doug and Bjelland that she thought Doug should receive a greater share of the farm "because he's farming himself and has to make a living on it." Bjelland carefully explained any decision was Florence's to make and that she could enter into an agreement to stay on the farm and have her living expenses provided by D & D. In accordance with Ed's will, Ed's D & D shares were distributed at the meeting: Florence received 405 shares, Doug received 9,795 shares, and Dwight received 9,795 shares. As a result, Florence held 20,400 shares (51%), Doug held 9,805 shares (24.52%), and Dwight held 9,795 shares (24.49%).

¶9 On March 19, 2008, Florence and Doug again met with Bjelland to discuss Florence's estate planning concerns, including her desire to avoid D & D assets being used to pay for her future nursing care. Florence took copious notes during the meeting. On or about March 27, 2008, Bjelland received a call from Florence and Doug in which Florence stated she decided to "gift substantially all of her stock, except for ten shares, to Doug." Bjelland prepared the stock certificates for the transfer, and sent the blank stock certificates to Florence. Around March 29, 2008, Florence received the blank certificates with Bjelland's instructions that noted "[u]pon signing these, then the certificates

4

comprising of your 20,004 shares should be cancelled or voided out." Florence and Doug discussed the transfer once more before she signed the stock certificates on April 1, 2008. Florence then directed Doug to mail the signed certificated back to Bjelland. Bjelland testified that he received the signed stock certificates Nos. 12 and 13 and made a note to cancel the old stock certificates Nos. 6 and 9, which he ultimately failed to do.

¶10 On April 3, 2008, Bjelland drafted an Agreement that allowed Florence to remain president of D & D for as long as she desired and was capable. The Agreement required Doug to vote his shares to retain Florence as president, and provided that D & D would pay her expenses as long as she resided on the farmstead. On April 4, 2008, Florence met with Frigge to discuss the Agreement and its terms. Florence and Doug signed the Agreement, and Frigge notarized and saved a copy of it.

¶11 Around April 4, 2008, after learning that Florence transferred her shares to Doug, Dwight drove to the farm and, without telling any other family member, took Florence back to Billings. Florence has not returned to the farmstead since that time. On April 16, 2008, Dwight filed a petition for guardianship and conservatorship of Florence in Yellowstone County. As part of the guardianship proceedings, Florence signed an affidavit stating that she did not understand what she signed when she transferred the D & D shares. Florence is now under a Guardianship and Conservatorship in Yellowstone County, with Dwight as guardian and Wuertz as conservator.

¶12 In early May 2008, Dwight began taking Florence to several doctors in Billings. Dr. Patricia Coon, Florence's treating physician since 2008, is a geriatrician that specializes in dementia, long-term care management, and senior assessments. Dr. Coon

referred Florence to the Senior Assessment Clinic at the Billings Clinic for additional testing regarding memory loss and anxiety. At trial, Dr. Coon opined, based primarily on medical history that Dwight provided for Florence and test results from the Senior Assessment Clinic, that Florence suffered from significant cognitive deficiencies and that Florence would need help with complex decision making. Dr. William Bredehoft is a psychologist that evaluated patients for the Senior Assessment Clinic. He testified by deposition regarding Florence's performance on neurological tests in 2008 and 2012, and opined that Florence suffered from a progressive cognitive decline. Dr. Bredehoft also testified he had no way of knowing when Florence's progressive dementia began, but that she had a mild impairment in May 2008 and a significant impairment in 2012 based on his two evaluations of her. Dr. Debra Sheppard is a neuropsychologist who also performed evaluations for the Senior Assessment Clinic. In her deposition, Dr. Sheppard testified that she diagnosed Florence with dementia and anxiety.

¶13 In November 2008, Florence executed a Power of Attorney to Dwight, and he used it to open joint bank accounts. On March 21, 2011, Florence entered a contract with Dwight to loan him $35,000 to purchase a 1968 GTO convertible. Shortly thereafter, Florence forgave the balance of the loan.

¶14 In June 2009, Dwight filed suit against Doug, alleging undue influence, and requesting, among other things, a judgment directing that all transferred D & D shares be deemed void and requiring Doug to compensate Florence for her emotional distress. In November 2014, following a three-day bench trial, the District Court entered its Findings of Fact, Conclusions of Law, and Judgment. The District Court found no evidence that

6

Florence was unduly influenced by Doug or incompetent from March 29 through March 31, 2008, or on April 4, 2008, the times during which she decided to gift her shares to Doug and signed the Agreement to stay on the farm. Dwight failed to convince the Court that Florence's gift was invalid because none of the medical experts could definitively say that Florence lacked the mental capacity to make a gift at the time she signed the stock certificates. Bjelland and Frigge testified they had no concerns regarding Florence's capacity to understand what she was doing at the time she discussed transferring the corporate stock, when she transferred the stock, or when she entered the Agreement to remain on the farm as president of D & D.

¶15 The District Court determined that Doug did not, at any time, exercise undue influence over Florence to convince her to gift her D & D shares to him. However, the District Court concluded that Dwight attempted to exercise undue influence over Florence through late night, high pressure phone calls, which Dwight recorded, in a clear effort to pressure his mother into splitting her D & D shares equally between Dwight and Doug. The District Court noted that Dwight never questioned whether Florence was competent to execute the Power of Attorney, to open joint bank accounts, to loan him $35,000 for a car, or to forgive his car loan. The District Court also concluded that the gift of stock from Florence to Doug was complete when Florence delivered the shares of stock to Doug. Once Doug accepted the stock, the gift became irrevocable, and the fact that "void" was not on prior issued stock certificates did not invalidate the gift.

¶16 Dwight and Wuertz, as conservator for Florence, now appeal the District Court's Findings of Fact, Conclusions of Law and Judgment.

7

## STANDARDS OF REVIEW

¶17 We review the findings of a district court sitting without a jury to determine if the district court's findings were clearly erroneous. M. R. Civ. P. 52(a); *Byrum v. Andren*, 2007 MT 107, ¶ 14, 337 Mont. 167, 159, P.3d 1062. We view evidence in the light most favorable to the prevailing party when determining whether substantial credible evidence supports the district court's findings. *Byrum*, ¶ 14 (citing *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, 53 P.3d 870). We review a district court's conclusions of law to determine whether those conclusions are correct. *Byrum*, ¶ 14 (citing *In re Estate of Harms*, 2006 MT 320, ¶ 12, 335 Mont. 66, 149 P.3d 557).

## DISCUSSION

¶18 *Issue One: Whether the District Court erred in finding no undue influence by Doug over Florence.*

¶19 Undue influence consists of:

(1) the use by one in whom a confidence is reposed by another person or who holds a real or apparent authority over the other person of the confidence or authority for the purpose of obtaining an unfair advantage over the other person;

(2) taking an unfair advantage of another person's weakness of mind; or

(3) taking a grossly oppressive and unfair advantage of another person's necessities or distress.

Section 28-2-407, MCA.

¶20 We employ the same criteria when determining whether undue influence was exercised on a donor making a gift as we employ in deciding whether undue influence was exercised on a testator making a will. *In re Estate of Harmon*, 2011 MT 84A, ¶ 20,

8

360 Mont. 150, 253 P.3d 821. To determine whether the statutory requirements for undue influence have been met, a court may consider:

> (1) any confidential relationship between the person alleged to be exercising undue influence and the donor; (2) the physical condition of the donor as it may affect his or her ability to withstand influence; (3) the mental condition of the donor as it may affect his or her ability to withstand influence; (4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to influence; and (5) the demands and importunities as they may affect the donor, taking into account the time, place and surrounding circumstances.

*Harmon*, ¶ 20 (citing *In re Estate of Harms*, 2006 MT 320, ¶ 21, 335 Mont. 66, 149 P.3d 557); *see also In re Estate of Bradshaw*, 2001 MT 92, ¶¶ 13–16, 305 Mont. 178, 24 P.3d 211. These criteria are nonexclusive considerations available to guide courts in the application of statutory requirements, and may or may not be present in any given undue influence case. *Harmon*, ¶ 20.

¶21 Courts consider whether, at the time the document was executed, the grantor or donor was mentally incompetent or undue influence was exerted. *In re Murphy's Estate*, 43 Mont. 353, 360, 116 P. 1004 (1911). "If the testator was of sound mind at the time he executed his will, it is immaterial what the condition of his mind was either before or after that time." *Murphy's Estate*, 43 Mont. at 360, 116 P. at 1004. The presumption is that the donor was competent and of sound mind, and undue influence or incompetence must be proven like any other fact. *Blackmer v. Blackmer*, 165 Mont. 69, 74, 525 P.2d 559, 562 (1974); *In re Estate of Bodin*, 144 Mont. 555, 559, 398 P.2d 616, 618–19 (1965). The burden of proof in showing substantial evidence falls upon the shoulders of the party claiming undue influence. *Blackmer*, 165 Mont. at 74–75, 525 P.2d at 562.

9

"Mere suspicion" is not enough to satisfy the party's burden to prove undue influence. *Harmon*, ¶ 22. Evidence of "specific acts" are an essential element of an undue influence claim. *Harmon*, ¶ 21. Evidence of a donor's mental state and kinship with the done is not evidence of specific acts. *In re Estate of Mead*, 2014 MT 264, ¶¶ 31–32, 376 Mont. 386, 336 P.3d 362; *Murphy's Estate*, 43 Mont. at 360, 116 P. at 1004.

¶22 Dwight maintains Doug exerted undue influence over Florence to gift her shares in D & D to Doug, and that the District Court failed to give credence to the medical experts' testimony, constituting reversible error. Dwight contends that the medical evidence established Florence lacked the requisite metal capacity to understand the transaction and suffered from dementia at the time of the gift. Dwight cites numerous tests Florence's doctor and medical experts used to diagnose Florence with cognitive decline from 2008 to 2012. Dwight also cites Dr. Coon's testimony that Florence should have had legal representation at the time she signed the documents.

¶23 Doug counters that the District Court weighed the medical evidence and correctly found no evidence that Doug pressed any demand or importunities upon Florence in late March or early April. Doug contends that "[l]awful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills." *See Hale v. Smith*, 73 Mont. 481, 488, 237 P. 214, 216 (1925). Furthermore, Doug contends the District Court findings that "evidence bearing on [Florence's] mental state and kinship with Doug is not evidence of 'specific acts'" of undue influence are not clearly erroneous.

¶24 The District Court weighed the evidence and found that Doug did not exert undue influence on Florence when she gifted her D & D shares to him. Both Doug and Dwight had relationships that could be considered confidential with their mother. *See Harmon*, ¶ 20 (citing *Harms*, ¶ 21). The District Court articulated that the testimony of various witnesses, including Florence's own taped words, illuminated her reasons to transfer her shares to Doug. Florence told Bjelland and Frigge about her concerns: she did not want the farm assets used to pay her nursing home care; she wanted to keep the family farm as a viable unit; and she wanted Doug to have more land because he was the one farming and had worked hard every day. Both Bjelland and Frigge testified they were convinced that Florence knew all the issues and was fully competent in March 2008 and on April 4, 2008. The District Court found that Florence's gift of shares to Doug was not unnatural and held it was not a result of undue influence on Doug's part. *Harms*, ¶ 32. We agree.

¶25 Dwight failed to meet his burden to establish Doug exerted undue influence over Florence. The evidence Dwight presented was "mere suspicion" of undue influence and he failed to show specific acts of undue influence to satisfy his burden. *Harmon*, ¶¶ 21-22. We will not substitute our judgment for that of the trial court on issues related to the weight of evidence, and we hold that these findings are not clearly erroneous. *See Albert v. Hastetter*, 2002 MT 123, ¶ 30, 310 Mont. 82, 48 P.3d 749.

¶26 *Issue Two: Whether the gift of stock certificates was actually a contract for which Doug furnished no consideration.*

¶27 Dwight argues that Doug failed to prove a gift inter vivos because the Agreement converted the "alleged" gift into an unenforceable contract. Dwight contends the

11

Agreement, allowing Florence to remain president of D & D and stay on the farm while D & D paid her living expenses, established that Florence gave Doug the D & D shares as consideration for the Agreement. Because a "gift" must be given "voluntarily and without consideration," *see* § 70-3-101, MCA, Dwight argues that the Agreement converted the "alleged" gift into an unenforceable contract since Doug lacked authority to enter into the Agreement without the consent of the D & D Board of Directors, who at the time were Doug, Florence, and Dwight. Dwight also argues Doug failed to perform on the Agreement.

¶28 Doug argues that Dwight failed to properly raise his unenforceable contract argument before the District Court, and cannot raise this argument for the first time on appeal. *See Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 17, 345 Mont. 368, 191 P.3d 435.

> The general rule in Montana is that this Court will not address either an issue raised for the first time on appeal or a party's change in legal theory. The basis for the general rule is that "it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider."

*Becker*, ¶ 17 (quoting *Unified Indus., Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, 961 P.2d 100) (internal citations omitted).

¶29 Dwight asserts the unenforceable contract argument is merely an additional argument to support the legal theory of an invalid gift, which should be reviewed on appeal. *See Wicklund v. Sundheim*, 2016 MT 67, ¶ 26, 383 Mont. 1, 367 P.3d 403. Yet Dwight frames the issue on appeal as an assertion that this alleged "gift" was, in fact, a contract that lacked consideration. Dwight's argument on appeal goes well beyond the

scope of the legal theory he presented to the District Court—that the gift was invalid—and presents an entirely different issue—that this was in fact a contract for which Doug furnished no consideration. This theory was not presented to the District Court. Accordingly, we decline to address it on appeal. *Easley*, ¶¶ 16–18.

¶30 *Issue Three: Whether the District Court erred in finding Florence made a valid gift of D & D Land Co. stock certificates to Doug.*

¶31 "A gift is a transfer of personal property made voluntarily and without consideration." Section 70-3-101, MCA. A gift inter vivos requires (1) donative intent, (2) delivery, and (3) acceptance. *Valley Victory Church v. Sandon*, 2005 MT 72, ¶ 14, 326 Mont. 340, 109 P.3d 273 (citing *Albinger v. Harris*, 2002 MT 118, ¶ 31, 210 Mont. 27, 48 P.3d 711). The only revocable gift recognized by Montana law is a gift in view of death. Sections 70-3-103, -201, MCA. Otherwise, a gift made without condition becomes irrevocable upon acceptance. Section 70-3-103, MCA; *Albinger*, ¶ 31.

¶32 "Delivery, which manifests the intent of the giver, must turn over dominion and control of the property to the recipient." *Albinger*, ¶ 31. When the essential elements of donative intent, voluntary delivery, and acceptance are demonstrated by clear and convincing evidence, the gift is complete. *Albinger*, ¶ 31. The court will not void the transfer when the giver experiences a change of heart. *Albinger*, ¶ 31 (citing *Gross v. Gross*, 239 Mont. 480, 781 P.2d 284 (1989) (holding a father was barred from revoking a gift of real property transferred to his son)).

¶33 Dwight argues that D & D Bylaws required, and Florence failed, to cancel the old certificates Nos. 6 and 9 by signing them, and the lack of a signature on the old

certificates invalidates any alleged gift. Doug asserts that if there were deficiencies in the actual process of transferring stock, they were a result of Dwight removing Florence to Billings after the gift.

¶34 Here, the District Court found the three essential elements of a gift inter vivos. *See Valley Victory Church*, ¶ 14. First, extensive testimony by Bjelland, Frigge, Doug, and Florence illustrated Florence's donative intent and her reasons to gift her D & D shares to Doug. *Albinger*, ¶ 31. Second, Florence voluntary delivered her D & D shares to Doug when she signed the stock certificates and physically gave the stock certificates to Doug, who sent them to Bjelland. *Albinger*, ¶ 31. Third, the gift was complete and irrevocable once Doug accepted the stock certificates. Section 70-3-103, MCA; *Albinger*, ¶ 31.

¶35 We agree with the District Court's conclusion that the fact "void" was not written on previously issued stock certificates Nos. 6 and 9 did not invalidate the completed gift of shares. The record supports the District Court's findings of Florence's donative intent, her delivery of the certificates to Doug, and Doug's acceptance of the certificates. Thus, the essential elements of an irrevocable gift inter vivos were satisfied. The fact that "void" was not written on the previously issued stock certificates, per the D & D Bylaws, is an insufficient basis "to elevate what are essentially just a private corporation's internally created rules to the same status as a statute passed or a code adopted by this State's Legislature." *Harwood v. Glacier Elec. Coop.*, 285 Mont. 481, 490, 949 P.2d 651, 656 (1997).

14

**CONCLUSION**

¶36    The District Court weighed the testimony and evidence presented, setting out detailed findings of fact regarding Florence's capacity and reasons to gift her D & D shares to Doug.  The District Court's findings of fact were not clearly erroneous.  The District Court's conclusions of law were correct regarding Florence's irrevocable gift inter vivos to Doug.  We affirm.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ DIRK M. SANDEFUR
/S/ JIM RICE